IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | |
|---|---|
| WILLIE LOVE, JR., ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | NO. 3:06-00754 |
| ) | JUDGE HAYNES |
| TVA BOARD OF DIRECTORS, et al., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Plaintiff, Willie Love, Jr., filed this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"), against the Defendants, the Tennessee Valley Authority ("TVA") Board of Directors; William B. Sansom, Chairman of the TVA; and TVA Board members Bill Baxter, Dennis Bottorff, Don DePriest, Mike Duncan, Skila Harris, Howard Thrailkill, and Susan Richardson Williams. Plaintiff asserts claims of race and age discrimination in the Defendants' hiring decision on a position for which he applied at one of TVA's plants.

Before the Court is the Defendants' motion for summary judgment (Docket Entry No. 17) contending, in sum: (1) that Plaintiff did not plead disparate impact discrimination in his complaint; (2) that Plaintiff failed to exhaust administrative remedies on his disparate impact discrimination claim; (3) that Plaintiff cannot make a prima facie showing of disparate impact; (4) that Plaintiff failed to present appropriate and sufficient statistical evidence to support his claim of disparate impact; (5) that Plaintiff cannot make a prima facie showing of disparate treatment race discrimination; and (6) that Plaintiff has failed to present sufficient evidence that the Defendants' non-discriminatory reasons for failing to promote him were a pretext for race or age discrimination.

In his response (Docket Entry No. 21), Plaintiff contends that his evidence shows: (1) that he was better qualified than the candidate selected; (2) that the Defendants used subjective criteria in their selection process; (3) that, in the selection process, the Defendants failed to follow both their own policies and generally accepted human resources principles; (4) that TVA's workforce suffers from underrepresentation of African Americans; (5) that Plaintiff properly raised his claim of disparate impact discrimination before the EEOC; (6) that Plaintiff's proof satisfies the prima facie showing of disparate impact; and (7) that Plaintiff presents statistical evidence to support his disparate impact claim. Plaintiff contends that this proof creates genuine issues of material fact about whether Defendants' hiring process and legitimate, nondiscriminatory reason for their failure to promote him was a pretext for race and age discrimination and whether he was subject to disparate impact discrimination.

In their reply (Docket Entry No. 31), Defendants contend that Plaintiff has failed to present evidence that his non-selection was the result of race or age discrimination.

For the reasons set forth below, the Court concludes the Defendants' motion for summary judgment should be denied. When the evidence is viewed in the light most favorable to Plaintiff, as required on this type of motion, Plaintiff has made a prima facie showing of disparate treatment based upon his race and age discrimination. Material factual disputes exist as to (1) whether a facially neutral employment practice caused racial disparities in the position that Plaintiff applied for, and (2) whether the stated reason for Defendants' decision not to select Plaintiff for the position is a pretext for discrimination. Given a recent Sixth Circuit decision on a similar claim, the Court concludes that Plaintiff's claim on his disparate impact cannot prevail.

2

## A. REVIEW OF THE RECORD[1]

Plaintiff, Willie Love, Jr., is an African American male who was 54 years old at the time relevant to this action and worked as a journeyman lineman for the TVA in Jackson, Tennessee. (Pl.'s Resp. to Def.'s Statement of Material Facts, Docket Entry No. 22 at ¶ 1.) Plaintiff challenges the TVA's failure to promote him to a lineman foreman position at TVA's Columbia, Tennessee plant. Id. at ¶ 3.

In November 2003, TVA's Transmission/Power Supply ("TPS") organization solicited applications from current TVA employees to fill a vacant lineman foreman position at its Columbia plant. Id. at ¶ 4. Daniel N. Miller, the transmission service manager in Columbia, was the selecting manager. Id. Seven TVA employees applied with TVA's human resources department to fill the position. Id. at ¶ 5. Clarence Heidel, a TPS human resource consultant, forwarded their applications to Miller with instructions for making the promotion decision. (Id. at ¶¶ 6-7; Heidel Dep., Docket Entry No. 17-4 at 5.) Heidel advised Miller to follow a two-step process in filling the lineman foreman position: first, before looking at applicants' paperwork, Miller was to identify and record criteria that he would use in evaluating applicants; second, Miller was to interview the applicants. (Docket Entry No. 22 at ¶¶ 7-9.)

In the first step of the process, Miller selected seven position functions and accountabilities

---

[1] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986), app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for a directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52, (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Under the applicable law, the Court concludes that material factual disputes exist and this section does not constitute findings of fact under Fed. R. Civ. P. 56(d).

3

("PFAs") to measure applicants' experience and developed thirty questions to ask during interviews. Id. at ¶¶ 10-11. Each PFA and interview question was assigned a point value, id. at ¶¶ 15, 22, and Miller decided that applicants' PFA scores would count for 40% of their total scores whereas interview scores would count for 60%, id. at ¶ 12.

Miller reviewed all seven applicants' applications, resumes, personal history records, and any supplemental information submitted by the candidates, and he determined that five out of the seven applicants, including Plaintiff, met the minimum qualifications for the lineman foreman position. Id. at ¶ 13. Miller then gave a PFA score to each qualified applicant by rating their applications and other paperwork against the PFAs and point values that he had selected, awarding four of the applicants (including Plaintiff) 120 points, while the remaining applicant, Randy Smith (the eventual selectee), was awarded 130 points. Id. at ¶¶ 13-18.

Miller next formed an interview team consisting of himself; Randall Smith,[2] a maintenance manager in Columbia; and Andrew Todd, a transmission service manager in Nashville. Id. at ¶ 24. According to Miller, none of them had any experience as linemen or lineman foremen. (Miller Dep., Docket Entry No. 17-7 at 80-81.) All of the interviewers are white (id. at 5; Docket Entry No. 22 at ¶ 25) and were 45 or 46 years old at the time of the selection.[3] Heidel and the rest of the interview team reviewed the 30 interview questions that Miller had developed to ensure that they were appropriate. Id. at ¶ 21. Miller did not develop model answers for the questions. (Miller Dep.,

---

[2] Interview team member Randall Smith bears no relation to the selectee, Randy Smith. (Randall Smith Dep., Docket Entry No. 17-8 at 19.) Their full names will be used throughout this memorandum to avoid confusion.

[3] Todd and Miller were 45 years old when the selection took place (Docket Entry No. 22 at ¶ 25; Miller Dep., Docket Entry No. 17-7 Ex. 6 at 2), and Randall Smith was 46 (Docket Entry No. 22 at ¶ 25).

4

Docket Entry No. 17-7 at 80.)

All five qualified applicants were interviewed on December 16, 2003. (Docket Entry No. 22 at ¶ 26.) Each interviewer independently assigned a score of one to five points for each answer given by a candidate. Id. at ¶ 28. Miller then averaged the interviewers' scores for each question and came up with a composite interview score for each candidate. Id. at ¶ 29. By weighting the interview and PFA scores 60% and 40% respectively, Miller was able to assign the candidates weighted scores and rank them in the following order:

| Rank | Name | Age | Race | Years at TVA | PFA Score | Interview Score | Weighted Score |
|---|---|---|---|---|---|---|---|
| 1 | Randy Smith | 38 | White | 17 | 130 | 350.7 | 26,242 |
| 2 | Michael Potts | 40 | White | 14 | 120 | 313.75 | 23,625 |
| 3 | Mark Herbst | 51 | White | 23 | 120 | 287.3 | 22,038 |
| 4 | Willie Love, Jr. | 54 | Black | 28 | 120 | 262.5 | 20,055 |
| 5 | James Polk | 58 | Black | 36 | 120 | 254.1 | 20,046 |

Based on this ranking, Miller selected Randy Smith for the promotion to lineman foreman, stating in a memorandum that he sent to Heidel:

> I have selected Randy L. Smith to fill this vacancy. During the interview process Mr. Smith emerged as the most qualified applicant to fill this position. From the interviews Mr. Smith demonstrated a superior knowledge on providing direction to a line crew and the importance of and uses of the various forms/reports required to be completed in this position. Additionally, he has an excellent knowledge of the information and uses of the TVA prints that are used in this position.

Id. at ¶ 31 (quoting Miller Dep., Docket Entry No. 17-7 Ex. 4).

After Plaintiff raised his claims of discrimination, Miller provided the Equal Opportunity Compliance ("EOC") staff specific reasons for the disparities between Plaintiff's and the selectee's

5

interview scores. (Findings, Analysis, and Decision on the Discrimination Complaint of Willie Love, Jr., Docket Entry No. 17-6 Ex. 13 at 3-5.) Miller explained that Plaintiff gave weaker answers than Randy Smith on questions addressing how he would motivate a crew, deal with discipline problems, plan his crew's work on a daily basis, and handle a particular work-related task. Id. at 3-4. Miller also noted that Randy Smith seemed to have a better understanding of TVA forms, such as pre- and post-job checklists and a drawing of a TVA structure. Id. Finally, Miller stated that Plaintiff received a lower interview score than Randy Smith in part because Plaintiff was not forthcoming about whether he planned on relocating to Columbia, if he were awarded the position. Id. at 4-5.

Plaintiff states that he was more qualified than Randy Smith for the lineman foreman position because he had been working at TVA for 28 years, compared to Randy Smith's 17 years. (Id. at ¶ 33; Love Dep., Docket Entry No. 17-5 at 10; Randy Smith Dep., Docket Entry No. 17-9 at 5.) In addition to his longer service at TVA, Plaintiff asserts that he had more relevant experience than Randy Smith because he had worked as a journeyman lineman for 23 years, whereas the selectee had held that position for only 13 years. (Docket Entry No. 11 at ¶ 34; Bruno Decl., Docket Entry No. 17-1 at 2.) Plaintiff argues that he also had substantially more supervisory experience, education, and training than the selectee. (Pl.'s Resp. to Def.'s Mot. for Summ. J., Docket Entry No. 21 at 12-13; compare Docket Entry No. 24-5 (selectee's training records) with 24-6 (Plaintiff's training records).) Plaintiff also notes that his work was rated better than fully adequate, TVA's highest rating, several times in annual performance evaluations, whereas Randy Smith's work was never rated any higher than fully adequate. (Docket Entry No. 21 at 7-8; compare Docket Entry No. 24-7 (selectee's performance evaluations) with 24-8 (Plaintiff's performance evaluations).) Plaintiff also

6

received recognition for his work through a TQM Professional Award in October 2002. (Docket Entry No. 24-11.) In addition, Plaintiff suggests that Randy Smith benefitted from favoritism, pointing out that Miller was Randy Smith's "second line" supervisor–the supervisor of Randy Smith's supervisor. (Docket Entry No. 21 at 6.) Plaintiff contends that Randy Smith was preselected for the lineman foreman position. (Docket Entry No. 17-6 Ex. 13 at 8-9.)

Plaintiff presents expert proof from Dr. William P. Anthony, Ph.D., Professor of Management, College of Business, Florida State University. (Prelim. Expert Report, Docket Entry No. 17-2.) Dr. Anthony's specialization is in human resources management, and, until the spring of 2007, he served as the Director of the DeSantis Center for Executive Management Education. Id. at 11. Dr. Anthony is the senior author of the textbook Human Resource Management, 5th edition, Thompson, 2006, and a co-author of Organizational Theory, 6th edition, Prentice Hall, 2003, both of which are widely used in colleges and business schools throughout the United States. Id. Dr. Anthony has testified in Title VII, wrongful discharge, harassment, and related actions. Curriculum Vitae, William P. Anthony, Ph.D., at 25-32, available at http://garnet.acns.fsu.edu/~banthon/anthony.pdf (last visited Oct. 18, 2007).

Dr. Anthony studied the selection process used in this case and opines that TVA failed to follow either its own policies or generally accepted human resource management standards in this selection. (Docket Entry No. 17-2 at 1.) Dr. Anthony finds that TVA's failure to adhere to its own policies or general standards in the selection at issue "created an environment where racial bias and discrimination could easily occur." Id. Dr. Anthony identifies four ways in which TVA violated its own policies in the selection process. Id. at 1-4.

First, Dr. Anthony points out that TVA policy dictates that job applicants are to be selected

7

on the basis of merit and efficiency, which the TVA has defined as follows:

> Merit and efficiency form the basis for selection of job candidates. Factors such as candidates' education, training, experience, ability, and previous work performance serve as a basis for appraisal of merit and efficiency. When employees are selected for positions covered by agreements negotiated by employee unions and organizations, the provisions of those agreements are followed. In applying the standards of merit and efficiency to hiring decisions, TVA's organizational needs, objectives and efficiency are also considered. These include, but are not limited to, the agency's affirmative action plans and goals.

(Filling Vacant Positions, Docket Entry No. 17-4 Ex. 2 at 136, quoted in Docket Entry No. 17-2 at 2.) Dr. Anthony states that "[m]erit and efficiency serve as the core of [TVA's] EEO policy in selection, yet it was not followed in this case." (Docket Entry No. 17-2 at 2.)

Second, Dr. Anthony observes that the PFA evaluations of the candidates that Miller completed gauged their experience against the functions and accountabilities of the foreman's job. Id. This is inappropriate, Dr. Anthony states, as "[c]andidates should not be rated against future duties and responsibilities . . . . It is simply guesswork." Id.

Third, Dr. Anthony notes that TVA failed to follow its performance appraisal guidelines by not providing Plaintiff with regular annual evaluations. Id. at 3. Dr. Anthony observes that Plaintiff's most recent evaluation before the selection at issue covered five years–1998 through 2003–whereas the selectee received reviews each year, consistent with TVA policy. Id. Dr. Anthony states:

> Providing the white candidates annual reviews while not doing so for African-Americans denies the African Americans the opportunity to receive formal structured feedback from their supervisor and the TVA as to their job performance and how they might improve. The purpose of performance appraisal is to give employees structured feed back on performance and to have a dialogue on performance and

8

> development.... When others are receiving regular appraisals and you are not, it sends the message that your performance and development are not important. Unequal and differential application of an important human resource policy between white employees and African-Americans is simply not acceptable and could show an indication of discrimination.

Id. Dr. Anthony notes that Plaintiff's failure to receive regular appraisals dampened the high ratings that he was given–instead of being rated better than fully adequate on two parameters for five successive evaluations, he received these ratings on one evaluation that covered five years. Id. Dr. Anthony states, "Love's high ratings apparently were not considered in the job selection decision. They should have been . . . ." Id.

Fourth, Dr. Anthony considered TVA to have failed to follow its diversity or affirmative action plans in the selection at issue. Id. at 3-4. Noting that "[p]eople who have the responsibility of making promotion and selection decisions need to be thoroughly trained on both EEO and affirmative action, especially if the organization has an affirmative action plan as does the TVA," Dr. Anthony observes that Miller recalled no discussion of affirmative action prior to the selection at issue or whether he had any training in affirmative action. Id. at 3. Dr. Anthony states, "Under every affirmative action program that I am familiar with, if a minority candidate is 'qualified' for a job, he/she should be offered it." Id.

Regarding general human resources standards, Dr. Anthony opines that the TVA's interview process was a form of structural behavioral interviewing, which is a process that relies on developing questions to elicit responses from a candidate that relate to the behaviors expected in a job. Id. at 6. Dr. Anthony describes structural behavioral interviewing as involving six steps:

1. A job analysis to determine the Knowledge, Skills, and Abilities ("KSAs") required in the job, including the desired behaviors performed by job

9

incumbents associated with these KSAs.

2. Developing questions that will elicit these desired behaviors based on the KSAs.

3. Pre-testing the questions with a sample of job incumbents to ensure validity and to determine benchmark acceptable responses.

4. Training interviewers through role-playing and in note taking, forming judgements against benchmark answers, and avoiding bias.

5. Conducting interviews in a way that minimizes bias, fatigue, halo, and learning curve effects and to ensure non-contamination among candidates.

6. Evaluating respondents' answers in an objective fashion.

Id. In Dr. Anthony's opinion, TVA's interview process failed to satisfy four of these requirements. Id.

First, Dr. Anthony notes that the questions were not screened by current lineman foremen to ensure their validity and to establish benchmark responses. Id. at 5. Observing that no one on the interview team had ever been a lineman foreman and that none of them were experts on the lineman foreman position, Dr. Anthony states that the questions should have been tested with lineman foremen to ensure that they would actually help Miller evaluate candidates in terms of the KSAs necessary for the position. Id. Dr. Anthony also notes that Miller alone determined how much of a candidates' total interview score each question would count, making the process less objective than if a sample of lineman foremen or a more rigorous analytical process determined the weights of each question. Id. Dr. Anthony also points to the question asking candidates whether they lived in or would move to Columbia, remarking that living in Columbia was not stated in the job description and that Miller testified that it was not a requirement for the job. Id.

10

Second, Dr. Anthony asserts that TVA's selection process departed from human resources standards in that none of the interviewers was trained on the structural behavioral interview method. Id. at 5-6.

Third, according to Dr. Anthony, insufficient procedures were in place to minimize the perceptual and judgment errors of interviewers, which he notes was especially important in this selection because some of the interviewers knew some of the candidates, including the selectee. Id. at 6-7.

Fourth, Dr. Anthony states that candidates were not evaluated or scored objectively, and he identifies four specific ways in which this occurred. Id. at 7-8. First, interviewers awarded partial points for candidate responses even though the scale they were given was numbered from one to five with no demarcation lines between numbers. Id. at 7. In other words, interviewers scored candidates' answers by making marks at various points between whole numbers, which makes it difficult to interpret their ratings. Id. Second, candidates' qualifications were not evaluated and scored in the PFAs. Id. Third, candidates' experience and qualifications were given insufficient weight in the selection process relative to the interviews, considering that the position was not one in which interview skills were important. Id. Finally, Dr. Anthony notes that no benchmarks were provided for scoring candidates' answers to interview questions, which would have "reduce[d] subjective judgments and biases." Id. Dr. Anthony also states that benchmarks were especially important in this selection because none of the interviewers had experience as a lineman foreman. Id. "[T]he lack of benchmarks for answers and the resultant subjectivity opens the door for bias in the interview process." Id.

Plaintiff presents evidence that in fiscal year 2001 in the Trades and Labor department–the

11

category into which the lineman foreman position falls–there were 1,086 promotional opportunities, and 98 of them, or 9%, went to minorities. (Docket Entry No. 21 at 18; Affirmative Employment Program for Minorities and Women: Accomplishment Report of Objectives for FY 2001, Docket Entry No. 24-9 at 6.) In the previous year, 62 of 942 promotions in Trades and Labor, or 6.6%, were given to minorities, and in 1999, 36 of 454 promotions, or 7.9%, were filled by minorities. (Docket Entry No. 21 at 18; Docket Entry No. 24-9 at 2, 5.) Plaintiff also notes that TVA has failed to reach its goals for minority employment in Trades and Labor. (Docket Entry No. 21 at 18-19.) In fiscal year 1999, TVA had a goal of 846 African American employees out of 5,068 total employees in its Trades and Labor department, but 470 employees were African American at that time, meaning that TVA fell short of its goal by 44%. (Docket Entry No. 24-9 at 10.) By fiscal year 2001, TVA sought to have 881 African Americans among the 5,274 Trades and Labor employees, but with only 488 African Americans in Trades and Labor for that year, African Americans were underrepresented by 45%. Id. at 18.[4]

## B. CONCLUSIONS OF LAW

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp.

---

[4] Plaintiff concedes that this data covers years prior to the selection at issue in this case (Docket Entry No. 21 at 18) but notes that Defendants failed to provide any additional information aside from that provided to Plaintiff's counsel in a previous case heard by the Court that involved the same attorneys, Dunlap v. TVA, Case No. 3:04cv0045. (Id.; Docket Entry No. 24-2 at 6-7.)

v. Catrett, 477 U.S. 317, 326 (1986). Accord Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.
>
> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data Processing, Inc., 873

13

F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in Celotex:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991) (quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrating the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Liberty Lobby). Moreover, the Court of Appeals explained that:

14

> The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1480 (citations omitted); see also Hutt v. Gibson Fiber Glass Prods., 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" (quoting Liberty Lobby)).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, <u>summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party</u>.
>
> * * *
>
> Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—"whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed</u>."

15

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:

> [I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: "The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . ."

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986).

The Sixth Circuit further explained a district court's role in evaluating the proof on a summary judgment motion:

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establish a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New International Dictionary (1986).
>
> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

16

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law."

6. As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

17

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1479-80 (footnotes omitted).

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the nonmoving party present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

As a threshold matter, "[s]ummary judgment is rarely granted in a plaintiff's favor in cases where the issue is a defendant's racial motivation, such as disparate treatment suits under Title VII or racial discrimination claims under 42 U.S.C. § 1981." Hunt v. Cromartie, 526 U.S. 541, 553 n.9 (1999). In the Sixth Circuit, particularly close scrutiny is required for motions for summary judgment in civil rights cases. Tarlton v. Meharry Medical College, 717 F.2d 1523, 1535 (6th Cir.

18

1984); Azar v. Conley, 456 F.2d 1382, 1384 n.1 (6th Cir. 1972). This principle does not, however, preclude an award of summary judgment in an appropriate Title VII case. Shah v. Gen. Elec. Co., 816 F.2d 264, 271 (6th Cir. 1987).

The ADEA prohibits discriminating against any individual with respect to the terms, conditions, and privileges of employment because of such individual's age. 29 U.S.C. §§ 623(a), (d). Title VII provides that it is unlawful for an employer to discriminate against any individual on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a).

There are two distinct theories of discrimination applicable here. First is the adverse impact theory, which was described by the Supreme Court in Griggs v. Duke Power Co., 401 U.S. 424 (1971) (Title VII disparate impact claims) and Smith v. City of Jackson, 544 U.S. 228 (2005) (ADEA disparate impact claims). Under this theory, a Title VII or ADEA plaintiff must prove that a specific employment practice adversely impacts a substantial number of a protected group; proof of discriminatory intent is not required. Watson v. Fort Worth Bank & Trust Co., 487 U.S. 977, 986 (1988); Smith, 544 U.S. 241-42. The rationale of this theory is that some employment practices adopted without a deliberately discriminatory motive may in fact be functionally equivalent to intentional discrimination and thus give rise to an ADEA or Title VII violation. Watson, 487 U.S. at 987. The second theory of discrimination is the disparate treatment theory, under which a plaintiff must prove that an employer treated her less favorably than a similarly situated employee who is not a member of a protected group. Proof of intentional discrimination is required. Teamsters v. United States, 431 U.S. 325, 335 n.15 (1977). Under disparate treatment theory, a plaintiff may submit direct or circumstantial evidence of intentional discrimination. Woythal v. Tex-Tenn Corp., 112 F.3d 243, 246 (6th Cir. 1996).

19

The Defendants contend that Plaintiff's disparate impact claim is not properly before the Court because Plaintiff did not raise a disparate impact claim in his complaint and thereby waived the claim. (Docket Entry No. 18 at 19.)

Plaintiff's complaint alleges, in relevant part, that "he was well qualified for the [lineman foreman] position but was not selected due to his race." (Docket Entry No. 1 at 3.) The complaint also states, "Plaintiff alleges that TVA has a long history and past record of failing to employ and promote blacks and other minorities."

The Court finds that the complaint is worded broadly enough that a disparate impact claim is reasonably within its scope. The Court also finds that the grounds upon which Plaintiff's disparate impact claim rests were made apparent to the Defendants during discovery when Plaintiff requested information regarding the racial makeup of TVA's workforce and upon the filing of Dr. Anthony's expert report. The Defendants have not argued that allowing Plaintiff to pursue a disparate impact theory will prejudice their defense upon the merits. "[T]he federal rules, and the decisions construing them, evince a belief that when a party has a valid claim, he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage . . ., provided that such a shift in the thrust of the case does not work to the prejudice of the opposing party." Oglal Sioux Tribe of Indians v. Andrus, 603 F.2d 707, 714 (8th Cir. 1979) (citation and internal quotation marks omitted) (cited in Bluegrass Center, LLC v. U.S. Intec, Inc., 49 F. Appx. 25, 31 (6th Cir. 2002)). The Court therefore finds that Plaintiff has sufficiently alleged a claim of disparate impact discrimination.

The Defendants next contend that Plaintiff's disparate impact claim is not properly before the Court because Plaintiff failed to exhaust his administrative remedies on the claim. (Docket

20