# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

WILLIE LOVE, JR.,       )
                   )
      **Plaintiff,**       )
**v.**                     )       **NO. 3:06-00754**
                   )       **JUDGE HAYNES**
**TVA BOARD OF DIRECTORS, et al.,**    )
                   )
      **Defendants.**       )

## MEMORANDUM

Plaintiff, Willie Love, Jr., filed this action under Title VII of the Civil Rights Act of 1964,

as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and the Age Discrimination in Employment

Act, 29 U.S.C. § 621 et seq. ("ADEA"), against the Defendants, the Tennessee Valley Authority

("TVA") and its Board of Directors. Plaintiff asserts claims of race and age discrimination in the

Defendants' promotion decision on a position for which Plaintiff applied at TVA's Columbia,

Tennessee plant. Plaintiff's specific challenge concerns TVA's agent's failure to promote him to

a lineman foreman position.

In earlier proceedings, the Court denied the Defendants' motion for summary judgment

(Docket Entry No. 17) concluding that when the evidence was viewed in the light most favorable

to Plaintiff, Plaintiff had made a prima facie showing of disparate treatment for his race and age

discrimination claims. Yet, the Court found material factual disputes on whether the Defendants'

stated reason for their decision not to select Plaintiff for the position was a pretext for

discrimination. The Court, however, dismissed Plaintiff's disparate impact claim. The Court

held a bench trial and thereafter, the parties submitted proposed findings of fact and conclusions

of law. (Docket Entry Nos. 69 and 70). Set forth below are the Court's findings of fact and

conclusions of law.

In sum, the Court finds that the Plaintiff's proof establishes a prima facie showing for his race and age discrimination claims in the Defendants' non-selection of Plaintiff for the promotion at issue. The Defendants' agent used subjective criteria in scoring applicants and the interview questions lacked verification of whether those questions were job related. Plaintiff has also proved that the Defendants' agent's stated reasons for his non-selection of the Plaintiff for this position was a pretext for racial discrimination. Based upon the Supreme Court's recent decision, the Court concludes that Plaintiff's proof cannot support a judgment on his ADEA claim.

## A. FINDINGS OF FACT

Plaintiff, Willie Love, Jr., is an African American male who was 54 years old at the time at issue in this action and had worked as a journeyman lineman for the TVA in Jackson, Tennessee. Plaintiff, a Vietnam veteran with a year of college, began work at the TVA in April 1975 as a laborer at TVA's substation in Martin, Tennessee. Later, Plaintiff was offered and accepted a four (4) year apprenticeship as a construction lineman. TVA required construction lineman to work eleven (11) months and twenty-nine (29) days with lay offs for inclement weather. Plaintiff completed the apprenticeship in five (5) years because to become journeyman lineman required 8,000 hours of apprenticeship.

After completion of that apprenticeship, Plaintiff continued in construction work at TVA, building power lines. For this work, the lines are not energized until completion of construction when maintenance workers assume responsibility for the lines. To build power lines requires a review of blueprints, definition of the lines' location, the terrain in the area, as well as the type of

2

structure, wire size, type of wire or steel coil and the amount of sway in the line. Plaintiff performed this construction work for ten (10) years, including as a crew leader in Jackson, Tennessee for three (3) years.

With a reduction in work, Plaintiff returned to his lineman position and was the foreman with the least seniority. As a lineman foreman, Plaintiff supervised the linemen and was responsible for the safety of the crew, for interpreting the blueprints and for construction of the lines. In the course of his work, Plaintiff traveled to all seven (7) TVA stations. After approximately ten (10) years, Plaintiff transferred to the maintenance side of TVA's work force to spend more time with his children.

Plaintiff's first maintenance job was in Tupelo, Mississippi from 1986 to 1989 where he moved with his family. Plaintiff later transferred to TVA's Covington, Tennessee station outside of Memphis for three (3) years before transferring back to Jackson, Tennessee for the next thirteen (13) years. In Jackson, Plaintiff served as a substitute foreman when the foreman was not on the job.

For eight (8) years, Plaintiff flew helicopters to patrol the power lines in the Jackson area that consists of eight hundred (800) square miles of power lines. This flying was to inspect the line, record his observations and to forward this information to TVA's Chattanooga office. Plaintiff's training for this responsibility included keeping the helicopter out of the power lines. Plaintiff also developed a computer program to select power lines for inspection. Plaintiff provided guidance for others who flew the TVA helicopter. Plaintiff would interpret the printouts to discern if another pilot were in the area as well as to detect a dangerous line.

Plaintiff's employment goal was to be a lineman foreman and he sought all available

3

training and served in the dual role as a substitute supervisor. Plaintiff received the same training as a line foreman. TVA awarded Plaintiff the Merit of Recognition of High Achievement and Continuous Learning. Plaintiff's Exhibit 31. Plaintiff also received training on computers, adversity awareness, individual development planning, and self leadership. Id. Plaintiff was twice nominated by his peers for the Transmission Operation Manager's award for his work achievement.

During his employment, Plaintiff applied for a series of promotions. Plaintiff applied for a line foreman in Memphis, but a younger man with more seniority was selected. Plaintiff as well as three (3) white employees also applied to be a line foreman position in Jackson, but despite Plaintiff's seniority, a white employee received the promotion.

In November 2003, TVA's Transmission/Power Supply ("TPS") division solicited applications from current TVA employees to fill a vacant lineman foreman position at its Columbia plant. TVA's Human Resource Consultant identified the vacancy; developed the job description; classified the position; prepared and posted the vacancy announcement; and notified candidates who are not selected. TVA's plant manager is responsible for the remaining selection process and selects the applicant for the position. Daniel N. Miller, TVA's transmission service manager in Columbia, was the selecting manager for this position.

TVA's Employment Practice 2 for vacant positions provides that "the steps for the selection of this position normally include the following:

- Identifying the vacancy.
- Developing the job description.
- Classifying the position.
- Preparing and posting the vacancy announcement .
- Developing a list of qualified candidates by reviewing personal history

4

records (PHRs), resumes, applications, and other background information.
- Selecting candidates for interviews to participate in the selection process (i.e., structured interview, etc.).
- Conducting selection process.
- Making the selection and extending the offer.
- Notifying candidates not selected.

(Plaintiff's Exhibit 1).

According to Miller, the minimum qualifications for this position were a high school degree or the equivalent; completion of a recognized journeyman lineman apprenticeship program; possession of a Class A commercial driver's license (or CDL); and at least three to five years of experience as a journeyman maintenance lineman. (Plaintiff's Exhibit 5; Plaintiff's Exhibit 12 at p. 1). Seven TVA employees applied with TVA's human resources department to fill the position including: Andrew Todd, 45 years old; Randall Smith, 47 years old, Daniel Miller, 46 years old and Love who were interviewed for the position. Except for Love, the other applicant-interviewees are white.

After the closing date, Clarence Heidel, a TPS human resource consultant, forwarded the applications to Miller with instructions for making the promotion decision. Heidel advised Miller to follow a two-step process in filling the lineman foreman position: first, before examining the applicants' paperwork, Miller was to identify and record criteria that he would use in evaluating applicants and then Miller was to interview the applicants. Miller, however, added functions to these positions as what he deemed proxies for the requisite experience for this position. (Plaintiff's Exhibit 9). With these modified qualifications, Miller developed a selection matrix. Id.

In the first step of the process, Miller selected seven position functions and accountabilities ("PFAs") to measure each applicant's experience and then developed thirty questions to ask during

5

interviews. Miller identified the seven PFAs for this position and rated the PFAs for each applicant on scale of 0-5 with the first three weighted at 20 and the remaining four a weight of 10. (Plaintiff's Exhibit 12 at p. 1). Miller entered the ratings into TVA's position selection matrix template, that calculated a PFA composite score for each of the five qualified applications. Plaintiff's Exhibit 9; Plaintiff's Exhibit 12 at p. 1). Each PFA and interview question was assigned a point value, and Miller decided that an applicant's PFA scores would count for 40% of his total score and the interview would count for 60% of the applicant's total score.

Miller reviewed all seven applicants' resumes, supplemental information personal history records and two candidates did not meet minimum qualifications and were not considered beyond the initial application. Four of the five qualified applicants, including Plaintiff, received a PFA composite score of 120. Id. Smith received a PFA composite score of 130. (Plaintiff's Exhibit 12 at p. 1). Smith's PFA composite score was 130 that was 10 points higher than Plaintiff's score because Smith received a rating of three on the fifth PFA and Plaintiff received a rating of two. (Defendants' Exhibit 2, 6; Defendants' Exhibit 12 at p. 1, Transcript, Volume 1 at p. 145). As to the basis of Smith's higher rating, Miller determined that "[Smith] did have an excellent knowledge of the Storm Water form that is required from any pole or crossarm changeout" (Defendants' Exhibit 9 at p. 6). Plaintiff "did not have a knowledge of the Storm Water form that is required for any pole crossarm changeout" (Defendants' Exhibit 9 at p. 2).

According to Miller, at this point in the selection process, there was not any significant difference between a score of 120 and 130 on the composite PFA scores in that "[t]he evaluation turned out basically the same for each one of the five." (Transcript, Volume 1 at p. 145; Defendants' Exhibit 23 at p. 3). According to Miller, after the first step of the selection process, the interview

6

would be the deciding factor in the selection. (Transcript, Volume 1 at p. 146.

The second step of the selection process was the interview, (Plaintiff's Exhibit 7 at p. 1) for which Miller developed 30 questions that he placed on the selection matrix. (Defendants' Exhibit 10; Defendants' Exhibit 12 at p. 3). According to Miller, these questions were in accordance with Heidel's directions to "[k]eep all questions job-related" and "with a valid purpose . . . related to the qualifications of the position." (Plaintiff's Exhibit 7 at p. 3). Miller sent his 30 questions to Heidel for his review and Heidel concurred that the questions were job-related. Each of the 30 questions was related on a 1 to 5 scale, with questions 1-6, 12-13, and 28-30 having a weight of 15; questions 14-15, 18-19, 21, 24-27 have a weight of 10; and questions 7-11, 16-17, and 22-23 have a weight of 5. (Defendants' Exhibit 12 at p. 3). Miller did not develop model answers for the questions.

Miller then formed an interview team of Randall Smith,[1] a maintenance manager in Columbia; Andrew Todd, a transmission service manager in Nashville; and himself. According to Miller, none of the committee members had any experience as linemen or lineman foremen. All of the interviewers are white. Randall Smith was also Miller's second in command in Columbia and served in Miller's absence and had some knowledge of line work. According to Miller, Todd holds the same position, transmission services manger in Nashville and had some knowledge of line work and was service manager for a number of years.

All five qualified applicants were interviewed on December 16, 2003. Each interviewer assigned a score of one to five points for each answer given by a candidate. Miller then averaged the interviewers' scores for each question and came up with a composite interview score for each candidate. By weighting the interview at 60% and PFA scores at 40%, Miller assigned the applicants

---

[1]Randall Smith bears no relation to the selectee, Randy Smith.

7

weighted scores and ranked them in the following order:

| Rank | Name | Age | Race | Years at TVA | PFA Score | Interview Score | Weighted Score |
|------|------|-----|------|--------------|-----------|-----------------|----------------|
| 1 | Randy Smith | 38 | White | 17 | 130 | 350.7 | 26,242 |
| 2 | Michael Potts | 40 | White | 14 | 120 | 313.75 | 23,625 |
| 3 | Mark Herbst | 51 | White | 23 | 120 | 287.3 | 22,038 |
| 4 | Willie Love, Jr. | 54 | Black | 28 | 120 | 262.5 | 20,055 |
| 5 | James Polk | 58 | Black | 36 | 120 | 254.1 | 20,046 |

Based on this ranking, Miller selected Randy Smith for the promotion to lineman foreman

for the reasons stated in his memorandum to Heidel:

> I have selected Randy L. Smith to fill this vacancy. During the interview process Mr. Smith emerged as the most qualified applicant to fill this position. From the interviews Mr. Smith demonstrated a superior knowledge on providing direction to a line crew and the importance of and uses of the various forms/reports required to be completed in this position. Additionally, he has an excellent knowledge of the information and uses of the TVA prints that are used in this position.

(Plaintiff's Exhibit 12 at p. 1).

After Plaintiff complained of discrimination, Miller provided TVA's Equal Opportunity

Compliance ("EOC") staff with his reasons for the disparities between Plaintiff's and Smith's

interview scores. Miller explained that Plaintiff gave weaker answers than Randy Smith on

questions addressing how he would motivate a crew, deal with discipline problems, plan his crew's

work on a daily basis, and handle a particular work-related task. Miller also noted that Smith seemed

to have a better understanding of TVA forms, such as pre- and post-job checklists and a drawing of

a TVA structure. Finally, Miller stated that Plaintiff received a lower interview score than Randy

8

Smith in part because Plaintiff was not forthcoming about whether he planned on relocating to Columbia, if he were awarded the position.

Plaintiff states that he was more qualified than Smith for the lineman foreman position because he had been working at TVA for 28 years, compared to Randy Smith's 17 years. In addition to his longer service at TVA, Plaintiff asserts that he had more relevant experience than Randy Smith because he had worked as a journeyman lineman for 23 years, whereas Randy Smith held that position for only 13 years. Plaintiff argues that he also had substantially more supervisory experience, education, and training than Smith (Plaintiff's Exhibits 18 and 19). Plaintiff also notes that several times, his work was rated better than fully adequate, TVA's highest rating, in annual performance evaluations, whereas Smith's work was never rated any higher than fully adequate. Plaintiff also received recognition for his work through a TOM Professional Award in October 2002.

As to favoritism, Plaintiff cites that Miller was Smith's "second line" supervisor. Plaintiff also cites question No. 29 "this position is in Columbia, where do you plan to live?" - as evidence that Miller wanted someone from Columbia to fill this lineman foreman position. (Defendants' Exhibit 10 at p. 4). Miller's justification for this question was that work on the weekends and 24 hours availability for any emergency were necessary because the person for this position had to call the crew to restore service for emergencies. If a lineman foreman lived outside the service area, the gathering of employees, equipment and materials can cause delays. Yet, this factor was not listed in the notice of the position.

Dr. William P. Anthony, Ph.D., Professor of Management, College of Business, Florida State University, Plaintiff's expert, specializes in human resources management, and, until the spring of 2007, was director of the DeSantis Center for Executive Management Education. (Plaintiff's Exhibit

9

35 at p. 11. Dr. Anthony is the senior author of the textbook <u>Human Resource Management</u>, 5th edition, Thompson, 2006, and a co-author of <u>Organizational Theory</u>, 6th edition, Prentice Hall, 2003, both of which are widely used in colleges and business schools throughout the United States. <u>Id.</u> Dr. Anthony has testified as expert in Title VII actions involving wrongful discharge, harassment, and related actions. After his review of TVA's selection process on this promotion, Dr. Anthony opined that TVA failed to follow either its own policies or generally accepted human resource management standards in this selection. Dr. Anthony found TVA's failure to adhere to its own policies or general standards in the selection at issue "created an environment where racial bias and discrimination could easily occur." Dr. Anthony identified four ways in which TVA violated its own policies in the selection process.

First, Dr. Anthony points out that TVA policy provides that job applicants are to be selected on the basis of merit and efficiency, which the TVA has defined as follows:

> Merit and efficiency form the basis for selection of job candidates. Factors such as candidates' education, training, experience, ability, and previous work performance serve as a basis for appraisal of merit and efficiency. When employees are selected for positions covered by agreements negotiated by employee unions and organizations, the provisions of those agreements are followed. In applying the standards of merit and efficiency to hiring decisions, TVA's organizational needs, objectives and efficiency are also considered. These include, but are not limited to, the agency's affirmative action plans and goals.

(<u>Filling Vacant Positions</u>, "Merit and efficiency serve as the core of [TVA's] EEO policy in selection, yet it was not followed in this case." See Plaintiff's Exhibit 2.

Second, Dr. Anthony observed that Miller's PFA evaluations of the candidates rated their experience against the functions and accountabilities of the foreman's job. <u>Id.</u> This is inappropriate

10

because as Dr. Anthony stated, "[c]andidates should not be rated against future duties and responsibilities . . . . It is simply guesswork." (Plaintiff's Exhibit 14 at p. 2).

Third, Dr. Anthony noted that TVA failed to follow its performance appraisal guidelines by not providing Plaintiff with regular annual evaluations. Id. at 3. Dr. Anthony observed that Plaintiff's most recent evaluation before the selection at issue covered five years–1998 through 2003–whereas the selectee received reviews each year, consistent with TVA policy. Id. Dr. Anthony states:

> Providing the white candidates annual reviews while not doing so for African-Americans denies the African Americans the opportunity to receive formal structured feedback from their supervisor and the TVA as to their job performance and how they might improve. The purpose of performance appraisal is to give employees structured feed back on performance and to have a dialogue on performance and development . . . . When others are receiving regular appraisals and you are not, it sends the message that your performance and development are not important. Unequal and differential application of an important human resource policy between white employees and African-Americans is simply not acceptable and could show an indication of discrimination.

Id. Dr. Anthony noted Plaintiff's failure to receive regular appraisals in his job, but Dr. Anthony states, "Love's high ratings apparently were not considered in the job selection decision. They should have been . . . ." Id.

Fourth, Dr. Anthony cited TVA's failure to follow its diversity or affirmative action plans in the selection at issue. Id. at 3-4. Noting that "[p]eople who have the responsibility of making promotion and selection decisions need to be thoroughly trained on both EEO and affirmative action, especially if the organization has an affirmative action plan as does the TVA," Dr. Anthony observes that Miller recalled no discussion of affirmative action prior to the selection at issue or whether he

11

had any training in affirmative action. Id. at 3. Dr. Anthony states, "Under every affirmative action program that I am familiar with, if a minority candidate is 'qualified' for a job, he/she should be offered it." Id.

Regarding general human resources standards, Dr. Anthony opined that the TVA's interview process was a form of structural behavioral interviewing, that is a process that relies upon developing questions to elicit responses from a candidate that relate to the behaviors expected in a job. Id. at 6. Dr. Anthony describes structural behavioral interviewing as involving six steps:

1. A job analysis to determine the Knowledge, Skills, and Abilities ("KSAs") required in the job, including the desired behaviors performed by job incumbents associated with these KSAs.

2. Developing questions that will elicit these desired behaviors based on the KSAs.

3. Pre-testing the questions with a sample of job incumbents to ensure validity and to determine benchmark acceptable responses.

4. Training interviewers through role-playing and in note taking, forming judgements against benchmark answers, and avoiding bias.

5. Conducting interviews in a way that minimizes bias, fatigue, halo, and learning curve effects and to ensure non-contamination among candidates.

6. Evaluating respondents' answers in an objective fashion.

Id. In Dr. Anthony's opinion, TVA's interview process failed to satisfy four of these requirements. Id.

In Dr. Anthony's opinion, the interview questions were not screened by current lineman foremen to ensure their validity nor were benchmark response established to evaluate an applicants response. None of the interview committee members had ever been a lineman foreman nor had expertise on the lineman foreman position. According to Dr. Anthony, the interview questions

12

should have been tested with lineman foremen to ensure that the applicant had the necessary experiences for this position. Dr. Anthony also notes that Miller alone determined how much of a candidates' total interview score would count, making the process less objective than if a sample of lineman foremen or a more rigorous process were used to determine the weight of each question. Dr. Anthony also points to the question of whether the applicant would live in or would move to Columbia, noting that living in Columbia was not stated in the job description and citing Miller's testimony that relocation was not a requirement for the job. Id.

Dr. Anthony also asserts that TVA's selection process departed from human resources standards in that none of the interviewers was trained on the structural behavioral interview method. Id. at 5-6. According to Dr. Anthony, insufficient procedures were in place to minimize the perceptual and judgment errors of interviewers, which he notes was especially important in this selection because some of the interviewers knew some of the candidates, including Smith. Id. at 6-7. Dr. Anthony further states that candidates were not evaluated or scored objectively, and he identifies four specific ways in which this occurred. Id. at 7-8. Interviewers awarded partial points for candidate responses even though the scale they were given was numbered from one to five with no demarcation lines between numbers. In other words, interviewers scored candidates' answers by making marks at various points between whole numbers, which makes it difficult to interpret their ratings. Moreover, candidates' qualifications were not evaluated and scored in the PFAs. The applicants' experiences and qualifications were given insufficient weight in the selection process relative to the interviews, considering that the position was not one in which interview skills were important. Finally, Dr. Anthony notes that no benchmarks were provided for scoring candidates' answers to interview questions, which would have "reduce[d] subjective judgments and biases." Id.

13

Dr. Anthony also states that benchmarks were especially important in this selection because none of the interviewers had experience as a lineman foreman. Id. "[T]he lack of benchmarks for answers and the resultant subjectivity opens the door for bias in the interview process." Id.

Dick Brabham, a TVA employee for more than twenty-five (25) years, was TVA's expert. Brabham has an undergraduate degree in personnel management and an MBA in management. Brabham has never testified as an expert nor published in the field of human resource management nor been subject to any peer review. Brabham described Dr. Anthony's structured interview process as a Cadillac and TVA's process as a Chevy. In Brabham's opinion, the TVA's Columbia plant management followed TVA policy in its selection decision. . Brabham opined that all candidates were treated the same and that the selecting manager selected the best qualified candidate. Brabham admitted that TVA's structured interviewing policy was not provided to this selection team. Brabham also admitted that despite TVA's policy requiring consideration of its affirmative plan action, that this policy was not considered in this selection process. Brabham did not know the applicants' education, training or experiences. Brabham was unaware that Plaintiff's performance evaluations were better than Smith's, the selectee.

Plaintiff presented evidence that in fiscal year 2001 in TVA's Trades and Labor category into which this lineman foreman position falls, there were 1,086 promotional opportunities, and 98 of them, or 9%, went to minorities. (Docket Entry No. 21 at 18; Affirmative Employment Program for Minorities and Women: Accomplishment Report of Objectives for FY 2001, Docket Entry No. 24-9 at 6.) In the previous year, 62 of 942 promotions in Trades and Labor, or 6.6%, were given to minorities, and in 1999, 36 of 454 promotions, or 7.9%, were filled by minorities. (Docket Entry No. 21 at 18; Docket Entry No. 24-9 at 2, 5.) Plaintiff also notes that TVA has failed to reach its

14

goals for minority employment in Trades and Labor. In fiscal year 1999, TVA had a goal of 846

African American employees out of 5,068 total employees in its Trades and Labor department, but

470 employees were African American at that time, meaning that TVA fell short of its goal by 44%.

By fiscal year 2001, TVA sought to have 881 African Americans among the 5,274 Trades and Labor

employees, but with only 488 African Americans in Trades and Labor for that year, African

Americans were underrepresented by 45%.[2]

## B. CONCLUSIONS OF LAW

For Plaintiff's Title VII and ADEA disparate treatment claims, both claims are based on

circumstantial, rather than direct, evidence, and so they "are analyzed under the same framework,"

Policastro v. Northwest Airlines, Inc., 297 F.3d 535, 538 (6th Cir. 2002); Felder v. Nortel Networks

Corp., 187 F. Appx. 586, 591 (6th Cir. 2006), namely, the burden-shifting analysis of McDonnell

Douglas Corp. v. Green, 411 U.S. 792 (1973). Policastro, 297 F.3d at 538. To succeed on a race

or age discrimination claim under McDonnell Douglas, a plaintiff must first make a prima facie

showing of discrimination, which "'creates a rebuttable presumption of discrimination, and the

burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for taking the

challenged employment action.'" Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 593 (6th

Cir. 2007) (quoting Carter v. Univ. of Toledo, 349 F.3d 269, 273 (6th Cir. 2003)). If the employer

articulates legitimate reasons, the burden shifts back to the plaintiff to show by a preponderance of

the evidence that the defendant's proffered reasons are a pretext for discrimination. Michael, 496

F.3d at 593; Bender, 455 F.3d at 620.

---

[2] Plaintiff concedes that this data covers years prior to the selection at issue in this case
(Docket Entry No. 21 at 18) but notes that Defendants failed to provide any additional
information aside from that provided to Plaintiff's counsel in a previous case heard by the Court

For his Title VII claims arising out of an employer's non-selection of the plaintiff for a job, the plaintiff must show: "(1) that he is a member of a protected class; (2) that he applied for, and did not receive, the job; (3) that he was qualified for the job; and (4) that a similarly-situated person who was not in the plaintiff's protected class received the job." Seay v. Tenn. Valley Auth., 339 F.3d 454, 463 (6th Cir. 2003) (citing Tex. Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 253-54 & n.6 (1981); Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160, 1166 (6th Cir. 1996)). This showing includes that "he was rejected in favor of another person who was not a member of his protected class." Allen v. Mich. Dep't of Corrs., 165 F.3d 405, 410 (6th Cir. 1999); see also Seay, 339 F.3d at 463 (noting that all a plaintiff must show to satisfy the fourth prong is "that a similarly-situated person who was not in the plaintiff's protected class received the job"). The Court concludes that Plaintiff's proof as a qualified minority who applied for, but was not selected satisfies this prima facie showing.

For his non-selection claim under the ADEA, a plaintiff's prima facie showing requires proof: (1) that plaintiff was more than 40 years old; (2) that plaintiff applied and was qualified for the position; (3) that plaintiff was not selected for the position; and (4) that a substantially younger applicant was selected. Hedrick v. W. Reserve Care Sys., 355 F.3d 444, 549-60 (6th Cir. 2004). Plaintiff was 54 years old at the time of the selection at issue and applied for the lineman foreman position. Miller determined that he was qualified for the position. Plaintiff was denied the promotion and Smith, a 38-year-old Caucasian was selected instead. The Court concludes that Plaintiff's proof satisfies the prima facie showing on his Title VII and ADEA claims. Thus, the burden of production shifts to the Defendants to present legitimate, nondiscriminatory reasons for Plaintiff's non-selection.

16

Here, the Court concludes that the Defendants have given legitimate reasons for Smith's selection for this position. The fact that Plaintiff did not score as highly as Smith during the selection process constitutes a legitimate business reason for Plaintiff's nonselection. See Sutherland v. Mich. Dep't of Treasury, 344 F.3d 603, 616 (6th Cir. 2003) (accepting a higher interview score as a legitimate, nondiscriminatory reason for a plaintiff's non-selection).

To establish pretext for his Title VII claim, Plaintiff "may succeed . . . either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256 (citing McDonnell Douglas, 411 U.S. at 804-05). In Hicks v.St. Mary's Honor Center, 509 U.S. 502, 518 (1993), the Supreme Court made clear that "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Moreover, the Court held that "it is not enough . . . to disbelieve the employer; the fact finder must believe the plaintiff's explanation of intentional discrimination." Id. at 519 (emphasis added). Rejection of the employer's proffered reasons as pretext "permit[s] the trier of fact to infer the ultimate fact of intentional discrimination." Id. at 511; see also Kline v. Tenn. Valley Auth., 128 F.3d 337, 347 (6th Cir. 1997).

For his ADEA claim, Plaintiff must prove that his age was the reason for his nonselection. Gross v. FBL Financial Services, Inc., 129 S.Ct. 2343, 2350, 2351 (2009) ("To establish a disparate treatment claim under the plain language of the ADEA, therefore, a plaintiff must prove that age was the "but for" cause of the employer's adverse action . . . by a preponderance of the evidence."). Plaintiff's proof did not meet this standard for his ADEA claim.

Plaintiff's evidence of pretext on his Title VII claim includes (1) the Defendants' use of

17

subjective criteria in the selection process; (2) Plaintiff's greater qualifications, (3) Miller's favoritism toward Smith, (4) Dr. Anthony's expert testimony regarding TVA's departures from its own policies and human resources standards, and (5) the statistical evidence of underrepresentation of African Americans in the Trades and Labor category at TVA.

As to proof of TVA's use of subjective criteria, that fact alone does not establish a Title VII violation. Browning v. Dep't of Army, 436 F.3d 692, 697 (6th Cir. 2006); Eubanks v. Pickens-Bond Construction Co., 635 F.2d 1341, 1347 (8th Cir. 1980). Yet, the Sixth Circuit has observed that subjective criteria provide "ready mechanisms for discrimination." Grano v. Dep't of Dev. of City of Columbus, 699 F.2d 836, 837 (6th Cir. 1983) (quoted in Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 461 (6th Cir. 2004)); see also Santana v. City and County of Denver, 488 F.3d 860, 866 (10th Cir. 2007) ("[E]vidence of pretext may include the use of subjective criteria.") (citations omitted).

The Court concludes that Miller's initial scoring of the PFA was subjective. The mere assignment of a number does not deprive the scoring of its subjectivity in assigning a number to a qualification. In the Court's view, the fact that four applicants, with different experiences and skills, received an identical score of 120 in Miller's scoring of their PFAs', underscores the subjectivity of Miller's scoring and gives a misleading appearance of equal treatment. There was not any validation by skilled workers of the interview questions for job relatedness. Interviewers were not shown to possess detailed knowledge of the position at issue nor were the interviewers given any guidance on what the appropriate responses to the questions would be. Thus, the interview panelists were left to their subjective views of each applicant's responses to the questions. The Court concludes that these collective facts establish the highly subjective nature of this selection process

18

and that these facts rebut the Defendants' stated reasons for Plaintiff's non-selection.

Plaintiff also presents evidence that he was better qualified for the lineman foreman position than Randy Smith who was selected. Albiet in the context of a summary judgment motion, in Bender v. Hecht's Dep't Stores, 455 F.3d 612, 625-28 (6th Cir. 2006), the Sixth Circuit stated:

> Whether qualifications evidence will be sufficient to raise a question of fact as to pretext will depend on whether a plaintiff presents other evidence of discrimination. In the case in which a plaintiff does provide other probative evidence of discrimination, that evidence, taken together with evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's claim surviving summary judgment. See, e.g., Jenkins [v. Nashville Pub. Radio, 106 F. Appx. 991, 995 (6th Cir. 2004)] (reversing lower court's grant of summary judgment; in addition to evidence of superior qualifications, the plaintiff provided evidence of "irregularities in the application and selection process," "inconsistencies in the reasons given . . . for not hiring her," and "the lack of African-American women in supervisory positions" at the company). On the other hand, in the case in which there is little or no other probative evidence of discrimination, to survive summary judgment <u>the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former</u>. In negative terms, evidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual.

Bender, 455 F.3d at 626-27 (emphasis added).

Applying Bender here, Plaintiff had almost twice as many years of experience with TVA than Smith. Plaintiff had more extensive training and experiences in TVA maintenance and construction work than Smith. Plaintiff received more awards and favorable job recognitions for his TVA work than Smith. The relocation factor cited by Miller was not listed in the job description nor in the qualifications for the position at issue. If significant, this factor should have been made known to all applicants at the time they applied. The Court concludes that Plaintiff's proof on his superior qualifications satisfies the "no reasonable employer" standard in Bender and his superior

19

qualifications are also evidence that the Defendant's agents's stated reason for his non-selection was a pretext for racial discrimination.

Plaintiff's evidence of favoritism toward Smith is that Miller preferred that the successful applicant live in Columbia and that Miller was Randy Smith's second line supervisor. The location factor was not disclosed until the interview and Miller added this question. These facts create a reasonable inference that Miller preselected Smith for the lineman foreman position. Despite Plaintiff's better qualifications and work experiences, Miller displayed his favoritism toward Smith in his determination of to give Smith a higher PFA score.

To be sure, favoritism alone is insufficient to support an inference of discrimination. Betkerur v. Aultman Hosp. Ass'n, 78 F.3d 1079, 1096 (6th Cir. 1996) (citing Holder v. City of Raleigh, 867 F.2d 823, 825-26 (4th Cir. 1989) ("To hold that favoritism . . . is per se violative of Title VII would be, in effect, to rewrite federal law. The list of impermissible considerations . . . is both limited and specific: 'race, color, religion, sex or national origin.' We are not free to add our own considerations to the list."). Unsubstantiated belief of favoritism is similarly insufficient. Mitchell v. Toledo Hosp., 964 F.2d 577, 584-85 (6th Cir. 1992) ("Even if the Court were to consider the Affidavit, the statements contained therein are nothing more than rumors, conclusory allegations and subjective beliefs which are wholly insufficient evidence to establish a claim of discrimination as a matter of law.") (citations omitted); Kelley v. Goodyear Tire & Rubber Co., 220 F.3d 1174, 1177 (10th Cir. 2000) ("A plaintiff cannot create a triable issue by making an assertion without supporting facts."). Here, Plaintiff's proof establishes more than his mere belief of favoritism. The Court concludes that Plaintiff's proof of favoritism also rebuts the Defendants' stated reason for Miller's selection of Smith.

20

As to Plaintiff's statistical data, the Sixth Circuit has recognized that significant underrepresentation of a racial group in an employer's workforce, combined with independent circumstantial evidence, can support an inference of discrimination. Hopson v. DaimlerChrysler Corp., 306 F.3d 427, 437-38 (6th Cir. 2002).

Plaintiff presented expert testimony regarding TVA's alleged departures from its own policies and human resources standards. Defendants contend such departures are irrelevant to the issue of discrimination. Yet "an employer's deviation from its own policies can, in some instances, provide evidence of pretext." Russell v. TG Missouri Corp., 340 F.3d 735, 746 (8th Cir. 2003). See also Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1220 (10th Cir. 2002); Bass v. Bd. of County Comm'rs, 246 F.3d 1095, 1108 (11th Cir. 2001). Dr. Anthony's opinions on TVA's departures from its own policies are thus relevant to the question of pretext. The Court concludes that TVA's departures from human resources standards created an environment where discrimination could easily occur.

In closing , based upon a review of the evidence, the Court concludes that Plaintiff's superior qualifications, experiences and job performance, the Defendants' use of subjective criteria for promotions, Miller's favoritism toward Smith with his belated usage of residency in the selection and interview process and Dr. Anthony's criticisms of TVA's agents' selection process, overcome that Defendants' agent's stated reasons for selecting Smith and that Miller's stated reasons are pretexts for racial discrimination. The Court is not finding that TVA had to follow Dr. Anthony's model for its promotion process, but finds Dr. Anthony's criticism to be legitimate and to underscore the subjectiveness of Miller's promotion criteria. TVA's expert lacked the requisite expertise and knowledge of this selection process and its applicants to be

21

persuasive. The racial disparities in the Trades and Labor category at TVA also provide further support for an inference of racial discrimination. Thus, Plaintiff's evidence is sufficient to overcome the Defendants' stated reasons for not selecting Plaintiff and proves pretext for his race discrimination claims.

As to remedies, the parties stipulated and the Court finds that given Plaintiff's resignation, his back pay award should be fourteen thousand, eight hundred twenty dollars ten cents ($14,820.10) with an enhanced monthly retirement benefit of one hundred forty-five dollars ninety cents ($145.90) per month since his retirement on January 6, 2006.

An appropriate Order is filed herewith.

ENTERED this the 27th day of July, 2009.

WILLIAM J. HAYNES, JR.
United States District Judge

22